DE GRAZIER v. LONGINOTTI. (No. 1346.)

(Court of Civil Appeals of Texas. Texarkana. Nov. 5, 1914.)

1. LANDLORD AND TENANT (§ 130*)—SUIT FOR NONPAYMENT OF TAXES—DEFENSE—BREACH OF COVENANT.

Conceding that a landlord consented to subletting, his collection of additional rent from the subtenant, who was not disturbed before the end of the term, was not a breach of the landlord's covenant for quiet enjoyment, constitut-

═══════

ing a defense to his suit against his tenant for nonpayment of taxes.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 470–481; Dec. Dig. § 130.*]

2. LANDLORD AND TENANT (§ 132*)—POSSESSION—DISTURBANCE.

A tenant is not damaged by his landlord's collection of additional rent from a subtenant.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 460–464, 467–469, 1198; Dec. Dig. § 132.*]

Appeal from District Court, Bowie County; W. T. Armistead, Judge.

Action by Joseph Longinotti against Tony De Grazier. From a judgment for plaintiff, defendant appeals. Affirmed.

Rollin W. Rodgers and R. P. Dorough, both of Texarkana, for appellant. Mahaffey & Thomas, of Texarkana, for appellee.

HODGES, J. Longinotti sued De Grazier to recover $301.93 as taxes which he alleged De Grazier should have paid on certain property, and for the conversion of some furniture and bar fixtures which had been left in the custody of De Grazier. De Grazier answered, denying any liability for the sum sued for, and sought a recovery on a counterclaim against Longinotti. At the conclusion of the evidence, the court instructed a verdict for the plaintiff, Longinotti, for the sum of $301.93, the amount of the taxes claimed, and against the defendant, De Grazier, on his counterclaim.

There appears to be no dispute about the facts in this case. Longinotti was the owner of a building situated in the city of Texarkana, Tex., and on August 1, 1906, leased it, together with some saloon furniture and bar fixtures, to De Grazier for a term of five years; the consideration being $100 per month and the payment of all taxes levied against the property during the term of the lease. The lease contained this provision:

"It is made a condition of this lease that second party (De Grazier) perform each and every covenant and obligation imposed upon him herein, among others to pay said rent promptly on first of each month in the manner stated, to keep said property in good repair, to pay all taxes and assessments against said property, and observe the conditions as to subletting of said premises and all other conditions of this lease. And upon a failure to perform any one of the above conditions to be performed by second party, this lease will, at the option of the first party (Longinotti), be at once terminated, and first party is hereby given the right in such event, without notice or demand, to enter into and upon said premises or any part thereof and expel the lessee or those claiming under him and remove his effects without being taken or deemed guilty of trespass or without prejudice to any remedies which might otherwise be used for arrears of rent."

The building was used by De Grazier and others for a saloon till some time in 1910, when the adoption of local prohibition made that business unlawful. It appears, however, that during the year 1909 De Grazier had sublet to one Holcombe, and that, after prohibition became effective, the latter subleased the property to G. W. Schiflin. In June, 1910, C. V. Brown purchased the sublease held by Schiflin and took possession of the building. He made some alterations and began using it for the exhibition of moving pictures. By agreement with Holcombe and De Grazier, Brown paid $100 per month as rent to De Grazier and $20.72 per month to Holcombe as a monthly apportionment of taxes to be paid at the end of the year. Longinotti resided in Hot Springs, Ark., and there is no evidence that he knew anything about these transactions, except what may be gathered from the correspondence that passed between him and De Grazier. On May 9, 1910, De Grazier wrote to Longinotti, telling him that the house had been closed since the 15th of the preceding month, and offered to surrender the lease. He also suggested that a party in Texarkana desired to rent the house for a picture show, and asked Longinotti what should be done with the property. Longinotti replied to this communication a few days afterwards, acknowledging the receipt of the check for the rent, and reminding De Grazier that he (Longinotti) still held him responsible for the rent, and also mentioned the fact that De Grazier had not explained what kind of a show the people he referred to wanted to operate and what alterations they desired to make in the building, or who the parties were. De Grazier replied, stating that the party who wanted the building was a gentleman and in every way responsible; that he would spend $400 or $500 "fixing up" the building. He stated that the building would be kept in good condition and properly cared for, and would be turned over to the owner in good shape at the expiration of the lease. He expressed a wish that he receive an early answer to his communication. There appears to have been no reply to this letter. Shortly thereafter Brown entered into possession of the building and began using it for the exhibition of moving pictures. Some time in August of the same year, Brown, without the knowledge of De Grazier, made a visit to Hot Springs and had a personal interview with Longinotti in regard to the property. It appears from Brown's testimony that Longinotti was very much displeased with the conduct of De Grazier in permitting him (Brown) to occupy the building for a picture show, and threatened to sue De Grazier for damages. It was finally agreed, however, between Brown and Longinotti that, if Brown would pay $50 a month in addition to what Longinotti was already receiving from De Grazier, Brown might continue his occupancy of the premises and would probably have the privilege of leasing the building after the expiration of De Grazier's lease, which then had about

one year more to run. Brown says that he went to see Longinotti for the purpose of securing this new lease upon the building, to begin after the expiration of that held by De Grazier; that Longinotti did not tell him explicitly that he might have the building after that time, but allowed him to believe that he would, and promised to give him an answer within a few days, but failed to do so. Brown, however, continued to pay to Longinotti the $50 per month and to De Grazier $100 per month, and the taxes to Holcombe, until some time about the 1st of February, 1911. De Grazier then learned for the first time of Brown's making the payments to Longinotti, and wrote to the latter repudiating his lease and disclaiming any further responsibility under the original contract. He also refused to pay the taxes which had accrued on the property for the year 1910, and which it is admitted amounted to $301.93 and were due. These taxes were subsequently paid by Longinotti. Brown continued in possession of the building, and thereafter paid monthly the $100 rent which had formerly been paid by De Grazier, the $50 which he was to pay Longinotti, and $20 additional, making $170 per month.

[1] The only defense which De Grazier urges in this suit is the conduct of Longinotti in demanding and receiving the $50 per month from Brown. He contends that this conduct was a breach of the covenant for quiet enjoyment. The proposition is based upon the assumption that Longinotti had consented in the first instance to the subletting of the property to Brown. Conceding that this assumption is justified by the evidence, there is nothing to show that either Brown or De Grazier was disturbed in the possession of the property, or in their rights under the lease. According to his testimony, which is not disputed, Brown desired a continuation of the lease after the expiration of that held by De Grazier, and sought an interview with Longinotti for the purpose of securing it, as well as to prevent any disturbance of his possession under De Grazier. It is true, as Brown states, Longinotti declined to keep his promise, and finally gave him notice to quit at the expiration of the De Grazier lease, which occurred about the 1st of August, 1911. This, however, was a matter between Brown and Longinotti exclusively, and did not in the least disturb the relations of De Grazier and Brown. De Grazier ascertained by accident that Brown was paying $50 per month to Longinotti. His repudiation which followed seems to have been prompted more by a feeling of resentment at this exaction on the part of Longinotti than by any actual disturbance of his possessory rights as a tenant. The evidence makes it clear that he sustained no damage, and that he was neither actually nor constructively evicted. In the absence of such consequences, the conduct of Longinotti in thus dealing with Brown is no defense to this action to recover the taxes then due. See 24 Cyc. pp. 1059 and 1129, where the authorities are referred to in the notes.

[2] The suit of De Grazier for damages is without merit. He had no right to collect from Brown more than Brown had agreed to pay him. If by some species of oppression to which Brown did not object, Longinotti procured from Brown an additional $50 a month, that sum did not belong to De Grazier. The facts do not show that De Grazier sustained any damages.

The judgment is therefore affirmed.